|, DAVID S. GORBATY, Judge.

FACTS AND PROCEDURAL HISTORY

On May 5, 1998, a Nissan Atima driven by Troylynn Washington struck a Ford Explorer driven by Michael Lewis at the intersection of Camp and Poydras Streets. The impact between the two vehicles caused the Explorer to roll over and strike a traffic signal support located at the intersection. The actual traffic signal became detached from the pole and subsequently struck Lisa Zachmann, a pedestrian walking near the intersection. The Explorer also rolled over onto two pedestrians, James L. Burnett, Jr. and Roberto Hinojo-sa, who were standing near the intersection as well. Mr. Burnett died the following day due to his injuries.
Jessie Ann Burnett, individually and as the surviving spouse of Mr. Burnett, and the natural tutrix of their seven minor children[1], and as the personal representative of the succession of James L. Burnett, Jr., filed suit on July 20, 1998 against Michael Lewis and his insurer, State Farm Mutual Insurance Company; Troylynn Washington and her insurer, State Farm Mutual Insurance Company; L USAA Casualty Insurance Company, Mr. Burnett’s uninsured motorist carrier; and the City of New Orleans. The case was allotted to Division J of Civil District Court for the Parish of Orleans.
Lisa Zachmann and her husband, Michael Zachmann, individually and on behalf of their minor child, Lauren, filed suit against the above-named defendants[2] on *524 March 24, 1999. The case was originally allotted to Division I of Civil District Court for the Parish of Orleans, but was subsequently consolidated with the lower-numbered Division J Burnett case. In August, 1999, the Zachmanns dismissed with prejudice defendants Washington and Lewis and their insurer, State Farm.
Robert Hinojosa and his wife, Donna, initiated suit against the same defendants on April 15, 1999. Their case was initially allotted to Division H of Civil District Court for the Parish of Orleans, but was also subsequently consolidated with the lower-numbered Burnett case in Division J.
The consolidated matter, which included these three separate sets of plaintiffs, went to trial on August 22, 2001. The fault of defendants Lewis and Washington was tried to a jury, and the liability of the City of New Orleans was argued to the Court, pursuant to LSA-R.S. 13:5105 and La. C.C.P. art. 1732(6). The jury rendered judgment in favor of the plaintiffs, and against defendants Lewis and Washington, and their insurer, State Farm. The jury found that Michael Lewis was seventy (70) percent at fault in causing the accident, Troylynn Washington was thirty (30) percent at fault, and the City of New Orleans was not at fault. The Injury awarded the Burnetts $1.6 million in general damages, $10,771 in medical expenses, $6,978 in funeral costs, and $1,266,326 for loss of economic support, plus interest from the date of demand until paid, and all costs of the proceedings. The jury awarded Roberto Hinojosa $500,000 in general damages and $150,000 in past and future medical expenses, and Donna Hinojosa $5,000 for past, present, and future loss of consortium, plus interest from the date of demand, and all costs of the proceedings. The jury awarded Lisa Zachmann $400,000 in general damages, plus $100,000 in past, present, and future medical expenses, and Michael and Lauren Zachmann each $5,000 for past, present, and future loss of consortium.
The trial judge concluded the proceedings and issued its judgment on October 2, 2001[3], finding in favor of the City and against all plaintiffs. The court found that the blame for the accident rested solely with Lewis and Washington. The court specifically held that “the plaintiffs have failed to prove beyond a preponderance of the evidence (1) the traffic signal light malfunctioned; (2) that the City had prior notice of the malfunction; (3) that the City had a reasonable opportunity to cure the defect; and (4) that the alleged defect was the cause in fact of their damages.” The court also found that “(1) Michael Lewis was speeding and either ran the red light or attempted to traverse the intersection on a late yellow light; and (2) Troylynn Washington was negligent in not looking for oncoming traffic prior to entering the intersection, or she in fact ran the red light.” Later, on November 27,2001, the trial court issued an Amended Judgment, because its first |4had erroneously rendered judgment against Troylynn Washington, a defendant who had settled with plaintiffs during trial. The deletion of Washington and her insurer was the only change to the October 2001 judgment. Subsequently, the plaintiffs filed separate appeals, which were consolidated. Inter-venor Texaco Exploration & Production Inc. (“TEPI”), the employer of James L. Burnett, Jr., also appealed.

*525
ASSIGNMENTS OF ERROR BY THE ZACHMANNS

1. The trial court erred in altering the jury interrogatories outside the presence of counsel, conducting jury polling, adopting the jury verdict in a bifurcated trial, and signing defendant’s Ex Parte Motion to Make the Verdict of the Jury the Judgment of the Court.
Plaintiffs assert that Judge Ramsey substituted jury interrogatories in place of those provided to plaintiffs’ counsel in the September 7, 2001 charge conference. It was not disclosed to them that the jury would apportion fault by interrogatory on the strict liability and legal fault claims brought against the owner and custodian of the traffic signal, they aver.
Appellants contend that the jury instructions were confusing because they inquired about apportionment of fault not relevant to strict liability claims. However, the jury was well aware that the City of New Orleans was the only defendant on trial, because Lisa Zachmann testified that she had settled all of her claims against the defendants except the City of New Orleans.
| ¡Although the trial court must give jury instructions that properly reflect the applicable law, it is not bound to give instructions to the jury in the exact words requested. The adequacy of jury instructions must be determined in light of the instructions as a whole. An appellate court must exercise great restraint before overturning a jury verdict because the instructions were so erroneous as to be prejudicial. Labove v. Raftery, 99-1414 (La.App. 3 Cir. 4/19/00), 759 So.2d 240. It is well settled that adequate jury instructions are those that fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3 Cir.1985). The mere discovery of an error in the trial judge’s instructions does not itself justify the appellate court conducting a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the ease. Id. at 1324.
In the instant case, the jury instructions and interrogatories adequately set forth the correct principles of law to be applied. Additionally, the record contains no evidence to support plaintiffs argument that the trial judge made an ex parte communication with the jury regarding jury instructions. This court has held that it will not presume that a judge made an ex parte contact with a jury absent some credible evidence to support such an allegation. Kennedy v. St Charles General Hospital Auxiliary, 630 So.2d 888 (La.App. 4 Cir.1993).
Appellants aver that the court’s signing of an ex parte motion to adopt the jury’s verdict has interdicted the fact-finding process in this case. This court has | fiheld that “nothing in the law or jurisprudence inhibits a judge from adopting a jury’s decision in a bifurcated trial, so long as [the judge] has independently considered the law and evidence first.” Clement v. Griffin, 91-1664, p. 7 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 432. We find no error in the trial court’s action.
Appellants did not brief the assignment of error pertaining to jury polling; thus, under Rule 2-12.4 of the Uniform Rules of Courts of Appeal, it is deemed abandoned.
This assignment of error is without merit.
2. The trial court erred in finding that plaintiffs’ expert cited to no evidence of professional standards that controlled defendant’s conduct, despite plaintiffs’ in *526 vocation of LSA-R.S. 48:35 and the probative documents cited as evidence of minimum standards at trial.
Plaintiffs’ own expert, Dean Tekell, did not testify to a clear applicable standard, but rather stated that the Manual of Uniform Traffic Control Devices (“MUTCD”) allows an agency and/or the traffic engineer to determine the type of post and mounting to be used at a specific intersection. Mr. Tekell also testified that there is no mandate included in any of the journals, manuals, or literature that require an agency to use a specific type of post or mounting at that intersection. Mr. Tekell concluded that election to utilize a breakaway type of signal mounting, as used here, was at the design engineer’s discretion. Further, all of the experts agreed that nothing in the MUTCD required the City of New Orleans to place a “red on red” sequencing of the lights at this intersection. Additionally, Marvin | ./Turner, the engineer specialist for the City of New Orleans, testified that in the Central Business District of New Orleans, the speed limit does not exceed thirty-five miles per hour, and that due to the close proximity of the traffic signals, the traffic engineer has the discretion to post speed limits or not. Based upon this testimony, we find no error in this ruling of the trial court.
3-6. The trial court erred in finding that there was no defect or liability for negligent conduct in re-erecting a nonconforming and defectively designed traffic signal; in finding that no unreasonably dangerous condition existed at the intersection of Camp and Poydras Streets, where the court was on judicial notice that the City failed to properly sign Camp Street with a speed limit sign, there was no inspection of the synchronization time-based controller before this accident following two other accidents in one week’s time, and that there was evidence of a malfunction of the time-based controller that existed at this intersection on the date of this accident; in finding that the City was not the cause-in-fact of the harm; in failing to find that the factual and circumstantial evidence documented through correspondence related to knowledge of hazardous knockdowns and traffic signal shop field work reports documenting the malfunctioning of the intersection’s time-based controller was evidence of a defective condition that existed before this accident.
LSA-R.S. 9:2800 provides in pertinent part:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
|SB. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
As such, the plaintiff must prove that (1) the defendant owned or had custody of the thing that caused the damage; (2) that the thing was defective in that it created an unreasonable risk of harm to others; (3) that the defendant had actual or constructive knowledge of the defect or unreasonable risk of harm and failed to take corrective action within a reasonable time; and (4) causation. Wilson v. City of New Orleans, 95-2129 (La.App. 4 Cir. 4/3/97), 693 So.2d 344. A municipal authority is deemed to have constructive notice if the defect existed for such a period of time that by exercise of *527 ordinary care and diligence, the municipal authority must have known of its existence, and the municipal authority had a reasonable opportunity to guard the public from injury by remedy of the defect. Dawson v. City of Bogalusa, 95-0824 (La.App. 1 Cir. 12/15/95), 669 So.2d 451.
At trial, plaintiffs alleged that the City improperly installed a breakaway post on the traffic signal, instead of a ridged post, at the intersection. Plaintiffs averred that if a ridged post had been utilized, the accident could have been entirely avoided, or the injuries less severe. Plaintiffs also contended that the post was improperly mounted and installed by the City on May 4, 1998 after a collision at the intersection on May 2,1998.
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). In Mart v. Hill, 505 So.2d 1120 (La.1987), the 1 flLouisiana Supreme Court posited a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Id. at 1127 (quoting Arceneaux v. Domingue, 365 So.2d at 1333 (La.1979)).
This test dictates that the appellate court must do more than simply review the record for some evidence that supports or controverts the trial court’s finding. Id. The appellate court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the factfinder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this court has emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal |inmay not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ” Housley v. Cerise, 579 So.2d 973, 976 (La.1991), (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
Courts have recognized that “[t]he reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective *528 courts.” Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
In its Reasons for Judgment, the trial court relied upon the expert testimony of Dean Tekell and Elmer Darwin in concluding that the City did not create an unreasonable risk of harm by installing a breakaway post at that intersection. The court stated:
Defendant’s expert, Elmer Darwin (“Mr. Darwin”), a City engineer, testified that the breakaway post was the safest to use at that intersection based on the number of accidents involving motorists at that location annually. He stated that the City, at their own discretion, chose to use the breakaway post as means of ensuring motorist safety within the city. Plaintiffs expert, Dean Tekell (“Mr.Tekell”), testified that the Manual of Uniform Traffic Control Devices (hereinafter the “MUTCD”) allows an agency and/or the traffic engineer to determine the type of post and mounting to be used at a specific intersection ...
| nAdditionally, the evidence presented at trial reflects that on May 2, 1998, the traffic signal support located at Camp and Poydras Streets was knocked down following a small collision. The traffic signal support was re-installed on May 4, 1998, the day before the accident in question. Both Mr. Darwin and Mr. Tekell testified that they found nothing wrong with the manner in which the City’s engineers installed the traffic signal support. This leads the Court to believe that the traffic signal support was properly installed on May 4, 1998, and that there was no defect in the installation of this pole which created an unreasonable risk of harm to Ms. Za-chmann or any other pedestrian traveling near that intersection.
Third, with regard to whether the City had actual or constructive knowledge of the defect or unreasonable risk of harm and failed to take corrective action within a reasonable time, the Court finds that it did not based upon the testimony of Mr. Darwin. First, Mr. Darwin testified that motorist safety at that intersection was a top priority for the City given the number of accidents in the past. He further testified that the breakaway post was the safest type of post to use at that intersection given [that] the breakaway post “breaks away” from the ground at the point of impact, thereby decreasing the degree of injury to motorists who strike the post. He noted that the [rigid] post would only increase a motorist’s injury in an accident type situation. Finally, he stressed to the Court that at no time during his twenty-six (26) years as an engineer with the City had a pedestrian ever been injured by [a] traffic signal or traffic signal support at that intersection. He asserted, for these reasons, the City had never been made aware of the potential harm of having a breakaway post installed at that location instead of a ridged post. He concluded the City was not in a position to remedy a problem it had no knowledge of before the time of this accident. The Court agrees.
... The Court finds Mr. Darwin’s testimony and the City’s reasoning for using a breakaway post at this intersection not only credible, but uncontradicted by the testimony of plaintiffs expert, Mr. Tekell.
We agree with this analysis and find the trial court’s conclusions to be reasonable in light of the evidence, record, and testimony. Plaintiffs failed to demonstrate at trial that the traffic signals, mountings, or *529 design was defective. They further failed to prove that the signals malfunctioned prior to the accident; the amount of time on the caution light was not sufficient to allow the reasonable and prudent driver to safely bring his or her vehicle to a stop, clear the intersection, or stop in the median; that the sequencing of the lights was defective; or that the type of post or mounting was improperly mounted and/ or installed. No testimony, lay or expert, supported appellants’ contention that a defect or malfunction caused the | ^accident in question. In short, plaintiffs did not meet their burden of proof under R.S. 9:2800. This assignment of error is without merit.
7. The trial court erred in failing to find that the City spoiled the evidence of the defective traffic signal by disposing of the evidence in bad faith after Judge Terri F. Love entered a protective order in this case.
Mr. Elmer Darwin testified that an investigation was undertaken but could not point to the City having collected any evidence. He stated that he was not made aware of this suit and did not see the protective order. We find no evidence in the record to support the contention of bad faith. This assignment of error is without merit.

ASSIGNMENTS OF ERROR BY THE BURNETTS, HINOJOSAS, AND INTER-VENOR TEPI

1. The trial court erred in applying an improper burden of proof, calling for the plaintiffs to prove their case “beyond a preponderance of the evidence,” rather than merely “by a preponderance of the evidence.”
In its Reasons for Judgment[4], the trial court stated:
In conclusion, the court finds the plaintiffs have failed to prove beyond a preponderance of the evidence (1) that the traffic signal and traffic signal support and mounting was [sic] defective; (2) that the City had prior notice of this alleged defect; (3) that the City of New Orleans had a reasonable opportunity to cure the defect; and (4) that the alleged defective condition was the cause in fact of their damages.
Here, the court was merely restating the applicable burden of proof set forth in La. R.S. 9:2800. In its Reasons for Judgment, the trial court fully analyzed each of the elements that had to be proven in order for the plaintiff to prevail. The trial court | ^reasonably relied upon the evidence and testimony presented at trial in concluding that the elements were not met. When the Reasons for Judgment are read in their entirety, it is evident that the trial court merely misstated, rather than misapplied, the standard of proof. This assignment of error is without merit.
2. The trial court improperly compelled the plaintiffs to prove that their recommended safety procedure (a red-on-red interval) must prevent all possible accidents, including those caused by drivers who intentionally violated the semaphore signals.
The trial court found that the plaintiffs’ experts did not prove that the City’s current traffic light sequence was defective. The court stated, “All expert witnesses agreed that a ‘red on red’ light does not prevent these types of accidents, since there would still be drivers who insist on stretching a yellow or running a red light no matter how much extra time is given.” *530 The court also pointed out that a “red on red” light was not required by the MUTCD. We find that it is reasonable not to require a “red on red light,” based upon the expert testimony and current safety standards.
3. The court erred in not requiring the City and its traffic engineer to exercise such discretion as they possessed in a reasonable manner.
Specifically, appellants take issue with the portion of the Reasons for Judgment that provides, “... [A]ll of the experts’ calculations reflect that the 4.8 seconds on the caution light was sufficient time to allow vehicles to safely stop or clear the intersection traveling at least 25 m.p.h.” Appellants argue that the 4.&jsecond14 interval was too short, arbitrary, and not based upon scientific analysis. Appellants contend that Mr. Darwin, the official city traffic engineer and its expert, did not exercise his discretion reasonably in establishing the interval time, and urge yet again that a red-on-red interval should have been utilized.
At trial, Mr. Tekell, plaintiffs’ expert, testified that in New Orleans, as well as elsewhere, people take advantage of the long amber intervals. He reasoned that because of this fact, it is not advisable to make the yellow interval too long. Having longer amber intervals may encourage people to get used to a “stretch” light, and take advantage of it. Mr. Tekell further indicated that the use of red-on-red intervals may be taken advantage of by people knowing they have extra protected time, and therefore “stretching” their time in the interval even longer. In light of the testimony presented, we find the trial court’s conclusion to be reasonable and not manifestly erroneous.
4. The trial court arrived at factual findings that were not definitive, and were internally inconsistent in that, on a fair reading, it could be concluded from the Reasons that the court found that both of the subject drivers “ran the red fight.”
Specifically, appellants point to that portion of the Reasons for Judgment that provides:
Conversely, the court finds that (1) Michael Lewis was speeding and either ran the red fight or attempted to traverse the intersection on a late yellow fight; and (2) Troylynn Washington was negligent in not looking for oncoming traffic prior to entering the intersection, or she in fact ran the red fight.
The court did not conclude that both drivers ran the red light. The court presented the possibility that either Michael Lewis or Troylynn Washington ran the liKred fight. Either scenario is supportive of the assessment of liability by the jury and does not impact the trial court’s finding that the City was not at fault in this accident. This assignment of error is without merit.
5. The trial court erred in giving credence to the testimony of experts who otherwise would not have qualified under the criteria established in the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); See also Kumho Tire v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); State v. Foret, 628 So.2d 1116 (La.1993). Appellants complain that Mr. Darwin failed to perform any kind of scientific analysis whereby his theory or technique could be tested. He utilized an arbitrary and otherwise empirically unsupported six percent of the eighty-second traffic sequence during off-peak hours to provide a brief amber interval of 4.8 seconds. Appellants also assert that Mr. Burkart’s methodology was flawed, without specifying how or why.
*531 In State v. Foret, the Louisiana Supreme Court discussed the admissibility of expert testimony:
La. C.E. art. 702 sets forth the general rule for the admissibility of expert testimony in Louisiana:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
As this provision is virtually identical to its source provision in the Federal Rules of Evidence, F.R.E. 702 and in several states’ evidentiary rules, we will examine and consider federal jurisprudence and other states’ jurisprudence interpreting the proper application of this rule.
“Subsumed in the requirements of Rule 702 is the premise that expert testimony must be reliable to be admissible.” State v. Cressey, 137 N.H. 402, 628 A.2d 696, 698 (N.H.1993). A recent United States Supreme Court case, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony.
In Daubert, the court was concerned with determining the admissibility of new techniques as basis for expert scientific testimony. Formerly, the test for admissibility of expert scientific testimony was based on a “short, citation-free 1928 decision” of the District of Columbia Court of Appeals, Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923). In Frye, the rule for admissibility of expert testimony was delineated as requiring “general acceptance” of a technique in its respective scientific field before the technique is considered admissible. 54 App.D.C. at 47, 293 F. at 1014. Finding that “a rigid ‘general acceptance’ requirement would be at odds with ‘the liberal thrust of the Federal Rules’,” the Court concluded that Frye’s “austere standard, absent from and incompatible with [this liberal thrust] should not be applied in federal trials.” 509 U.S. at 587, 113 S.Ct. at 2794 (citations omitted).
The court replaced Frye with a new standard that requires the trial court to act in a “gatekeeping” function to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” Id. This requirement stems from a belief that the rules on expert testimony serve to relax “the usual requirement of first-hand knowledge” to ensure reliability on the part of a witness. 509 U.S. at 591, 113 S.Ct. at 2796. This relaxation is justified so long as “the expert’s opinion (has) a rehable basis in the knowledge and experience of his discipline.” Id.
The reliability of expert testimony is to be ensured by a requirement that there be “a valid scientific connection to the pertinent inquiry as a precondition to admissibility.” Id. This connection is to be examined in light of “a preliminary assessment” by the trial court “of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.” Id. The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the technique had been subjected to peer review *532 and/or publication, the “known or potential rate of error”, the existence of “standards controlling the technique’s operation”, the technique’s “refutability” or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. 509 U.S. at 593, 113 S.Ct. at 2797.
Foret at 1121-1122 (footnotes omitted).
h7At trial, Darwin testified that he used the same basic formula as that which is found in the industry periodical prepared by the ITE Technical Council Task Force. He stated, “[The formula] relates to reaction time, stopping distance, and the width of the intersection, and there’s maybe another variable or two that goes into it.” Thus, contrary to appellants’ assertion, Darwin did utilize a mathematical formula in determining the 4.8 second interval at the light in question. The trial court is accorded vast discretion concerning admission of evidence and its decision will not be reversed on appeal absent abuse of that discretion. O’Neill v. Thibodeaux, 97-1065 (La.App. 3 Cir. 3/6/98), 709 So.2d 962. Defendant’s experts’ testimony was both reliable and relevant. This assignment of error is without merit.
6. The court failed to rectify by proper charge or instruction the prejudicial closing argument that stated that circumstantial evidence only applies in criminal cases.
Courts grant wide latitude to closing argument. Temple v. Liberty Mutual Insurance Co., 330 So.2d 891 (La.1976). The fact that such a statement was briefly mentioned in closing does not constitute reversible error, in fight of the fact that the overall evidence supported the court’s final judgment. This assignment of error lacks merit.
7. The record is incomplete, there being no transcript of the jury charge that could be found in the Record obtained by appellate counsel.
Appellants did not brief this assignment of error; thus, under Rule 2-12.4 of the Uniform Rules of Courts of Appeal, it is deemed abandoned.
|1S8. The cumulation of errors in evi-dentiary rulings, coupled with other circumstances at trial were so prejudicial as to deprive the plaintiffs of their day in court, even if none of the errors considered alone would be sufficient to rise to the level of reversible error. Fromenthal v. Delta Wells Surveyors, Inc., 98-1525 (La.App. 4 Cir. 10/4/00), 776 So.2d 1.
Appellants’ argument is a reference to the other assigned errors addressed herein. Having found no merit to those assignments of error, we likewise find no merit to appellants’ cumulation of errors argument.
Intervenor TEPI has further requested that its intervention be recognized if this Court reverses the judgment of the trial court absolving the City of New Orleans of liability. Since this Court has not reversed that portion of the trial court’s judgment, we deny TEPI’s request.

ASSIGNMENTS OF ERROR BY THE BURNETTS

The Burnetts have filed a separate brief alleging two additional assignments of error.
First, they argue that the trial court erred in issuing an order that acknowledged that State Farm had tendered the limits of its insurance policy on November 21, 2001, where neither the policy itself nor evidence of its terms had been admitted into evidence at trial.
Next, they assert that the trial court erred in ordering that State Farm’s *533 tender of November 21, 2001 stopped the running of legal interest on the principal amount of the judgment, and barred the Burnett plaintiffs from taking any further action to enforce their judgment.
|19On December 28, 2001, State Farm filed an ex parte pleading, which resulted in the issuance of an order by the trial court on January 3, 2002. The order provided:
IT IS ORDERED that this Honorable Court hereby acknowledges that on November 21, 2001 State Farm ... tendered to plaintiff the amount of $12,451.76; hereby holds that legal interest on the principal amount awarded by this Honorable Court in its final judgment in the matter of funds, ceased running as of the date of said tender of funds, and hereby bars plaintiff and plaintiffs’ counsel from attempting to take any additional action regarding the principal amount of the judgment and interest forwarded to date.
The Burnett appellants filed a Motion to Vacate this order. State Farm opposed their motion. The Motion to Vacate was heard on May 10, 2002, and denied by the trial court, without reasons, on May 17, 2002. On June 13, 2002, the Burnett appellants were granted leave to appeal this judgment.
Appellants rely upon Payton v. Colar, 488 So.2d 1271 (La.App. 4 Cir.1986); however, it is completely distinguishable from the case at bar. In that case, no introduction of evidence of the policy limits or evidence of the insurance policy was made at trial. Nine months later, the defendant attempted to introduce the policy into evidence. In the instant case, from the transcript, it is clear that State Farm introduced into evidence as Defendant’s Exhibit Lewis Number 3, without objection, the declaration sheet, a policy information sheet, at trial. This declaration sheet showed the limits of the State Farm policy. For some unknown reason, this exhibit did not later appear in the record. We earlier allowed the record to be supplemented with the policy information sheet. We find that the evidence of the policy terms was admitted into evidence at trial.
laoThe Burnetts argue that there is no evidence to show what interest State Farm owes because of the judgment rendered against its insured.
State Farm tendered the policy limits, plus interest, on November 21, 2001, prior to the issuance of the final Amended Judgment on November 27, 2001. In Remedies v. Lopez, 560 So.2d 118 (La.App. 3 Cir.1990), the Third Circuit stated:
La. R.S. 13:4203 provides that “Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, ‘ex delicto’, which may be rendered by any of the courts.” It has consistently been held that this statute creates a rule of public policy requiring liability insurers to assume responsibility for legal interest on the applicable policy limits from date of judicial demand until paid. See Soprano v. State Farm Mutual Automobile Ins. Co., 246 La. 524, 165 So.2d 308 (1964). This, however, is not the issue presented for our consideration herein. The precise issue presented for our consideration is whether or not the aforementioned statute requires the insurer to assume responsibility for legal interest on the amount of any excess judgment (the amount of the judgment beyond the insurer’s policy limits) from date of judicial demand until paid. We find that it does not.
560 So.2d at 119. An insurance policy may, by supplemental provision, provide greater exposure for legal interest. The policy at issue here provides that legal interest on the excess judgment ends upon *534 tender of the policy limits. Therefore, whether by operation of law, or under the terms of the policy, no additional interest obligation exists on the excess judgment. We therefore find that the trial court’s order of January 8, 2002 was proper.

CONCLUSION

Accordingly, for the foregoing reasons, the judgments of the trial court are affirmed.
| ^AFFIRMED.

. Rachel Lynn Burnett, James Clayborn Burnett, II, Taylor Brook Burnett, Van Michael Burnett, Loni Michelle Burnett, Jacob Riley Burnett, and Joshua Thomas Burnett.

. The Zachmanns did not file suit against USAA, Mr. Burnett's uninsured motorist carrier.

. The trial court issued two judgments dated October 2: one for the Zachmanns and one for the other plaintiffs.

. The Reasons for Judgment referred to are those pertaining to the Burnetts, Hinojosas, and TEPI.